**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **ERICKY BOGUES,** | * | |
| **Plaintiff** | * | |
| v. | * | **Civ. No. DLB-22-2735** |
| **WARDEN JEFFREY NINES,** *et al.*, | * | |
| **Defendants.** | * | |

**MEMORANDUM OPINION**

Ericky Bogues, who is currently incarcerated at North Branch Correctional Institution ("NBCI") and proceeding without counsel, filed a civil rights complaint pursuant to 42 U.S.C. § 1983. ECF 1. He claims Dr. Asresahegn Getachew, the prison doctor, and Warden Jeffrey Nines violated his Eighth Amendment rights by failing to provide adequate medical care and pain medication. *Id.* Dr. Getachew filed a motion to dismiss or, in the alternative, for summary judgment, ECF 16, and Nines filed a motion to dismiss, ECF 23. Bogues opposes both motions. ECF 19 & 25. Additionally, Bogues filed a motion for leave to file Exhibit D, ECF 21, which is granted. A hearing is not necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons stated below, both motions, treated as motions for summary judgment, are granted.[1]

## I.      Background

In 2004, before he was incarcerated, Bogues was shot, and a bullet broke the bones in his left knee. ECF 1, at 6.[2] He was taken to Johns Hopkins Hospital and learned that "parts of [his] knee could never be replaced because [the] bones w[]ere crushed by [the] bullet." *Id.*

---

[1] The Clerk shall amend the docket to reflect the full and correct spelling of Dr. Getachew's name.

[2] The pages of the complaint are docketed out of order. The page numbers cited for the complaint and other filings are the pages assigned by the Court's electronic docketing system.

Since April 29, 2005, Bogues has been in the custody of the Maryland Department of Public Safety and Correctional Services.  *Id*.  On October 19, 2018, at Bon Secours Hospital, wires were arthroscopically removed from his left patella.  ECF 16-2, at 5 ¶ 10; ECF 1, at 5.  Bogues states in his affidavit that, at the time of the 2018 surgery, the doctor prescribed "Tramadol of 50 mg three times a week for the pain as needed."  ECF 19-1, at 3.[3]

Dr. Getachew explains that Ultram, or Tramadol, is "an opioid-like pain medication" that "may be effective analgesics" but has the "serious and common side effect of psychological and physical addiction."  ECF 16-2, at 3 ¶ 6.  The risk is particularly high in patients with a history of addiction or substance abuse.  *Id*.  Additionally, long-term use of opioids creates a tolerance for the medications, making them lose effectiveness over time.  *Id*. ¶ 7.  In a correctional setting, opioids are known to cause sedation, tolerance, and respiratory depression and therefore are considered dangerous.  *Id*. at 3–4 ¶ 7.  Opioid pain relievers are often used illicitly to get high, are traded for other contraband, and can be used in suicide attempts.  *Id*. at 4 ¶ 7.  Even if the patient who is prescribed the opioid pain reliever does not intend to abuse the drug, he "may become a target for violence or other manipulation to obtain access to the patient's drugs."  *Id*.  Dr. Getachew states that these considerations require Tramadol to be "prescribed carefully in the correctional setting."  *Id*.

According to Dr. Getachew, Bogues has a history of medication abuse.  *Id*.  Dr. Getachew notes that February 6, 2019 lab results showed that Bogues had a subtherapeutic amount of Tegretol in his system, which meant he was not taking the medication as prescribed.  *Id*.  Based on those lab results, Bogues's Tegretol prescription was discontinued on February 11, 2019.  ECF

---

[3] Bogues's summary of his treatment history for his knee closely tracks the medical records and Dr. Getachew's declaration, except where otherwise noted.  ECF 19-1.

16-13, at 2.  Bogues states that he "never had a history of selling or misusing any form of medications," and that he uses the medications prescribed for him.  ECF 19-1, at 3.

On February 13, 2019, orthopedist Dr. Ashok Krishnaswamy saw Bogues at Bon Secours Hospital for a follow-up appointment to the 2018 arthroscopic surgery.  ECF 16-13, at 26.  Dr. Krishnaswamy ordered physical therapy "at least twice a week for 6-8 weeks."  *Id*.  Dr. Getachew states that Dr. Krishnaswamy also noted that Bogues could be fitted with a "patella-stabilizing knee brace," that wound care should continue until the wound was completely healed, and that Bogues "can be on Tramadol 50 mg three times daily ('TID') as needed ('prn') for pain."  ECF 16-2, at 5 ¶ 10.[4]  Dr. Krishnaswamy asked for Bogues to come back for a follow up in 6 to 8 weeks.  *Id*.  Bogues claims that he has not been back to Bon Secours Hospital since that 2019 visit.  ECF 1, at 4.

On February 18, 2019, Holly Pierce (n.k.a Holly Hoover), CRNP, ordered a patella-stabilizing knee brace and continued a prescription for Naproxen to address Bogues's pain, noting he was "able to [exercise] without difficulty which includes squats and burpees."  ECF 16-12, at 50.  Additionally, Pierce submitted a consultation request for physical therapy.  *Id*. at 48–49.  Bogues received the knee brace on February 27, 2019.  *Id*. at 47.

On March 1, Pierce submitted another request for 10 sessions of physical therapy, which Dr. Getachew approved on March 6.  ECF 16-, at 5 ¶ 12; ECF 16-13, at 25–26.  Bogues had an initial evaluation on March 14, and then had physical therapy sessions from March 15 through May 9.  ECF 16-2, at 5 ¶ 12; ECF 16-12, at 30–32, 36–39, 42.

---

[4] The defendant submitted more than 500 pages of medical records but, seemingly unintentionally, omitted 45 pages, including the pages memorializing Dr. Krishnaswamy's February 13, 2019 notes.

On April 1, 2019, Dr. Getachew saw Bogues via telemedicine.  ECF 16-2, at 6 ¶ 13.  Bogues complained of chronic pain and asked for Tramadol or Neurontin.  *Id.*  Dr. Getachew told Bogues he would consider referring his request to the multidisciplinary pain management team.  *Id.*

Two weeks later, on April 15, Dr. Getachew saw Bogues in chronic care and Bogues again complained of left leg pain.  ECF 16-2, at 6 ¶ 14.  Dr. Getachew examined Bogues's left knee and noted that Bogues had a full range of motion with mild excess fluid in his knee joint.  *Id.*  Dr. Getachew requested an orthopedic follow-up and prescribed Tramadol based on Dr. Krishnaswamy's recommendation and Bogues's complaints of pain.  *Id.*

Later that day, after further review of Bogues's record, Dr. Getachew cancelled the Tramadol prescription.  *Id.* at 7 ¶ 16.  He states that he changed his mind about Tramadol because of the risks of long-term use in a correctional setting, Bogues's ability to exercise and perform activities of daily living ("ADLs") without taking Tramadol, and Dr. Getachew's belief that the pain in Bogues's left knee could be relieved with "a change in weight-bearing exercises."  *Id.*  Dr. Getachew also explains that the follow-up appointment with the orthopedist was approved but delayed several times: The orthopedist was out of the country, Bogues refused a visit, and other reasons beyond Dr. Getachew's control.  *Id.*, *see also* ECF 16-13, at 28.[5]  Bogues ultimately had a follow-up appointment on May 6, 2020.  *Id.*; ECF 19-1, at 5–6.

Meanwhile, on April 24, 2019, Dr. Getachew saw Bogues again through telemedicine and, at this appointment, prescribed Nortriptyline, an antidepressant that is also used to relieve musculoskeletal pain.  ECF 16-2, at 7 ¶ 15; *see also* ECF 16-12, at 21–22.  Dr. Getachew told

---

[5] Dr. Getachew notes several instances when Bogues allegedly refused medical appointments, *see* ECF 16-2, at 8 ¶ 20; *id.* at 10 ¶ 24; *id.* at 14¶ 38; *id.* at 15 ¶ 42, but he offers only *unsigned* release of responsibility forms to show Bogues refused to appear.  *See, e.g.*, ECF 16-9, at 9, 17, 30, 33, 39–41, 49.  As a result, this Court gives no weight to the allegations that Bogues intentionally missed appointments.

Bogues that the medication would not relieve all pain but would help him to perform ADLs.  *Id*. At this time, Bogues's knee was not swollen.  *Id*.  Dr. Getachew also advised Bogues to stop doing sit-ups, to focus on building up his upper extremities, and to walk without straining his patella.  *Id*.

On May 9, 2019, Bogues had his final physical therapy session and said his left knee had improved.  ECF 16-2, at 7 ¶ 17; ECF 16-12, at 16.  Bogues rated his pain a two out of 10 and did not show any discomfort during the session.  *Id*.

On July 12, Bogues was seen by Stacie Mast, RN for complaints of knee pain.  ECF 16-2, at 8 ¶ 18; ECF 16-12, at 3.  Bogues stated that his left knee was swollen, but when Mast examined him, she did not see any evidence of edema.  *Id*.  Mast noted that Bogues was able to bend his knee and climb onto the exam table without difficulty.  *Id*.  Bogues said he was waiting for a post-operative follow-up visit and denied refusing to report for two scheduled provider visits earlier that month.  *Id*.

On August 7, Bogues was seen by Pierce, and he asked for Neurontin or Tegretol for his ongoing knee pain.  ECF 16-11, at 48.  Pierce denied his request and explained that he had been prescribed both medications in the past but had not taken them.  *Id*.  Bogues promised he would take the medication "this time" and then demanded to see the onsite doctor because "he gives the candy."  *Id*.  Notably, Bogues told Pierce he was taking care of his hypertension by exercising for one to two hours a day, including doing burpees, squats, planks, and sit-ups.  *Id*.

On October 2, Bogues was seen at sick call by Ashley Garlitz, RN, for his knee pain.  ECF 16-2, at 8 ¶ 20; ECF 16-11, at 40–41.  His left knee was swollen, and he only could move it with pain.  *Id*.  Bogues complained that the pain medication he was prescribed did not work, and he said that he had previously been prescribed Ultram.  *Id*.  Garlitz said a physical therapy evaluation and treatment would be ordered for him.  *Id.*

Garlitz saw Bogues again on October 29.  He complained that his left knee was swollen and that he had not seen a provider yet; Garlitz once again said a physical therapy evaluation and treatment would be ordered for him.  ECF 16-2, at 9 ¶ 20; ECF 16-11, at 36–37.  "Per protocol," she ordered Bogues "motrin ib for pain."  *Id.*

On December 5, when Bogues was seen by William J. Raynor, RN, Bogues complained that his knee was swollen and painful.  ECF 16-11, at 29.  Raynor did not observe any swelling, and he noted that Bogues could bear weight on each leg independently.  *Id.*  Bogues was prescribed ibuprofen and instructed to elevate his left leg with ice if the inflammation returned.  ECF 16-2, at 9 ¶ 21.

Dr. Cedric Poku-Dankwah evaluated Bogues on January 8, 2020, for pain medication and a "special shoe."  ECF 16-2, at 9 ¶ 22; ECF 16-11, at 26–27.  Bogues did not appear to be in distress, so Dr. Poku-Dankwah did not order any additional treatment for him.  *Id.*

On March 16, Dr. Jaleh Daee saw Bogues for chronic care.  ECF 16-2, at 10 ¶ 25; ECF 16-11, at 14–16.  Bogues's left knee was slightly larger than the right, but there was no sign of infection and he could stretch his left knee without difficulty and walk normally.  *Id.*  Prior x-rays of Bogues's knee showed arthritic changes, which Dr. Daee believed could be the cause of the swelling.  *Id.*  Dr. Daee ordered another x-ray, capsaicin ointment, and Tylenol.  *Id.*  Additionally, Dr. Daee recommended a podiatrist evaluation to assess whether Bogues's flat feet contributed to his pain and to determine whether he needed orthotics.  *Id.*  Bogues was to return for a provider visit in two weeks.  *Id.*

On April 13, 2020, Bogues put in a sick call slip for chronic knee pain and complained he was not receiving enough medication.  ECF 16-11, at 10.  Bogues could not be seen because of restrictions put into place as a result of the COVID-19 pandemic.  *Id.*  Holly Hoover (f.k.a. Holly

Pierce) noted in Bogues's chart that, during "segregation rounds," Bogues is "often seen standing on items such as books, trays, or the sink," and he often kicks the cell door.  *Id*.  His treatment plan was not changed.

On May 6, 2020, Bogues had his follow-up appointment with Dr. Krishnaswamy via telemedicine.  ECF 16-2, at 11 ¶ 29; ECF 16-11, at 4; ECF 19-1, at 5–6.  Dr. Krishnaswamy recommended another MRI of Bogues's left knee and a prescription for Mobic, 15 mg daily.  *Id*. He wanted Bogues to return for a "face to face visit" in four to five weeks, after the MRI was completed.  *Id*.  Utilization Management reviewed Dr. Krishnaswamy's recommendations, determined that medical necessity had not been demonstrated for either an MRI or a follow-up visit with an orthopedic specialist, and provided an alternative treatment plan on May 13 for an x-ray and an "onsite follow-up."  ECF 16-2, at 11 ¶ 30; ECF 16-13, at 31–32, 35.  Dr. Getachew does not have a role in Utilization Management decisions.  *Id*. at 12 ¶ 30.

In June, Dr. Getachew and Hoover decided to discontinue Bogues's prescription for Mobic and to order Celebrex instead because Bogues stated that Mobic was not working for him.  ECF 16-2, at 12 ¶ 32; ECF 16-10, at 42.  Bogues insists there was no reason to discontinue his medications because he had no history of abuse or misuse.  ECF 19-1, at 2–3.  An x-ray of Bogues's left knee revealed "mild degenerative changes" but "no acute osseous abnormality and only stable post-operative changes."  ECF 16-2, at 12 ¶ 33.

On August 11, Dr. Getachew saw Bogues via telemedicine, with nurse Lori Kester present. ECF 16-2, at 12 ¶ 34; ECF 16-10, at 34–35; ECF 19-1, at 6.  Bogues said the pain in his knee was preventing him from exercising and interfering with his ADLs.  ECF 16-2, at 12 ¶ 34; ECF 16-10, at 34–35; ECF 19-1, at 6.  Because Bogues said his pain had been controlled well with Tegretol, Dr. Getachew prescribed Tegretol for Bogues and "re-added Mobic."  ECF 16-2, at 12 ¶ 34; ECF

16-10, at 34–35; ECF 19-1, at 6.   A November 24, 2020 appointment with Dr. Getachew was cancelled due to a COVID-19 outbreak at NBCI.  ECF 16-2, at 13 ¶ 34; ECF 16-10, at 27.

On April 16, 2021, Dr. Howard Cook saw Bogues for a provider visit and submitted a consultation request for orthopedic surgery after Bogues said he had a damaged patella that required the attention of a surgeon.  ECF 16-2, at 13 ¶ 35; ECF 16-10, at 8–11; ECF 16-13, at 37– 40.  Dr. Cook's request was returned with a request for a copy of the orthopedic note from May 6, 2020 and a physical examination.  ECF 16-13, at 37–38.  Dr. Cook examined Bogues on May 28. ECF 16-10, at 3–4.  Dr. Cook noted that Bogues had a four out of five level of strength in his left leg in three of the tests performed, with full strength in other tests.  *Id.*  Bogues said he did not have any pain during the tests, but he claimed that when he did have pain in his knee, it was a 10-out-of-10 level of pain.  *Id.*  Utilization Management reviewed Dr. Cook's notes and determined that medical necessity for an orthopedic surgeon visit had not been demonstrated since Bogues was "pain-free and basic ADLs were not noted to be affected."  ECF 16-13, at 37.  In lieu of the orthopedic surgery consult, Utilization Management recommended a home exercise program for strengthening along with oral analgesics to address any pain.  *Id.*

On July 30, Bogues reported to sick call for his complaint of neck pain.  He was supposed to be seen by Burnice Mace, RN, but he made inappropriate sexual comments to her, and the visit was terminated.  ECF 16-2, at 13 ¶ 36; ECF 16-9, at 50–51.  The medical records state that on August 2, Bogues refused to come to sick call, refused to sign a form confirming his refusal, and said he would not see "that bitch Nurse Burnice."  ECF 16-9, at 49.  Bogues insists in his affidavit that he never refused sick call.  ECF 19-1, at 7–8.  On August 24, Bogues's sick call appointment for his knee was cancelled because he made inappropriate sexual comments to the nurses when he entered the room.  *Id.* at 47.

When Hoover saw Bogues on September 29 for chronic care, he told her that he had been kneeling a lot to talk under his cell door and to send notes to inmates in other cells, a practice known as "fishing."  ECF 16-2, at 14 ¶ 37; ECF 16-9, at 44–46.  Hoover prescribed Ibuprofen, ordered an EKG,[6] labs, and knee x-rays and advised Bogues to stop kneeling.  *Id*.  Bogues declined the tests and the x-rays.  ECF 16-9, at 39–41 (unsigned release of responsibility forms).

On April 27, 2022, Bogues filed an administrative remedy procedure request ("ARP") in which he complained that he had knee pain and said that he had seen a medical provider on April 11 and asked for orthopedic shoes but not received them.  ECF 19-3.  He sought the shoes and monetary compensation for his pain.  *Id.*

At a chronic care visit on May 17, 2022, Dr. Getachew noted that Bogues's knee had a decreased range of motion, although it was not swollen.  ECF 16-2, at 15 ¶ 41; ECF 16-9, at 18–20.  Bogues asked for tennis shoes with cushion to help with his knee pain, and Dr. Getachew asked "the nurse to send [a] letter to custody to allow [Bogues] to purchase new tennis shoes."  ECF 16-9, at 18.  Dr. Getachew renewed Bogues's prescription for Tegretol.  *Id*.

On June 7, Bogues came to sick call and told Cynthia Taferi, RN that he needed to see Dr. Getachew about pain in his foot, his swollen knee, and a renewal of his medical shoe order form.  Taferi noted that Bogues's left knee was slightly swollen, but he did not seem to be in distress.  ECF 16-2, at 15 ¶ 42; ECF 16-9, at 14–15.  The same day, Bogues's ARP was found meritorious in part, and he was told he would be referred to a podiatrist about the shoes.  ECF 19-3.  The line for the "Signature of Warden/Managing Official/Designee" is signed by someone other than Nines.  *Id.*  On June 11, Ernest Massalla, RN noted that a letter still needed to be sent to "custody"

---

[6] Bogues has hypertension.  ECF 16-9, at 44.

regarding Dr. Getachew's May 17 recommendation for Bogues's shoes.  ECF 16-2, at 15 ¶ 43; ECF 16-9, at 13.

On July 13, Bogues saw podiatrist Dr. Michael Berger about his foot pain and was ordered a new "off-shelf pair of medical/orthopedic shoes."  ECF 16-2, at 16 ¶ 45; ECF 16-9, at 6–7.  Throughout August and September of 2022, Bogues was prescribed Tegretol for his knee pain and was seen in sick call nine times.  ECF 16-2, at 16 ¶¶ 46, 47; ECF 16-8, at 41–51; ECF 16-9, at 3–5.  Bogues received orthopedic shoes on October 3, 2022.  ECF 16-5, at 6; ECF 16-8, at 39.

On October 20, Bogues saw RN Coffman at sick call and reported his left leg was so swollen with fluid, he could not bend it.  ECF 16-2, at 17 ¶ 49; ECF 16-8, at 32–34.  Bogues complained that the Tegretol was not working for his pain and asked to have a doctor remove the fluid from his knee so he could move it.  *Id*.  Coffman confirmed that Bogues's knee was swollen with fluid collection.  *Id*.  Coffman then referred Bogues for further evaluation and provided a compression bandage to help with the pain and swelling.  *Id*.

The same day, Bogues filed this civil rights action to challenge the sufficiency of the medical care he has received in prison.  ECF 1.  Bogues complains that, since his 2018 surgery, even though he has arthritis and painful inflammation in his knee, Dr. Getachew has refused to prescribe Ultram or other narcotic pain relievers to treat his pain "because of the potential for inmate abuse."  *Id.* at 5–6.  Bogues maintains that he has never had a problem with drug abuse when taking Ultram or Neurontin.  *Id*. at 4.  He also alleges that Dr. Getachew has refused to order an MRI or to refer Bogues to an outside medical provider.  *Id*.  He notes that he had four surgeries on his left knee in 2022 for damage to the surrounding tissue in his knee.  *Id.*  He claims that during 2022, he was required to walk to the medical unit over 50 times with a swollen, fluid-filled knee.  *Id*.  He further claims that most of the time he cannot participate in outdoor recreation because too

much pressure on both of his feet causes pain and makes walking difficult. *Id*. He states that he is "now made to wear orthopedic shoe[s]" which were ordered by Dr. Getachew. *Id*. Bogues claims he has severe depression and anxiety about being unable to defend himself in prison as a result of his pain and untreated knee. *Id*. He claims his knee is starting to deteriorate. *Id*. at 6.[7]

---

[7] Bogues continued to receive medical care after he filed suit. On October 31, Dr. Getachew saw Bogues via telemedicine for chronic care, with nurse Lori Kester present to assist with the physical examination. ECF 16-2, at 17 ¶ 50. Bogues's left knee was still swollen and there was evidence of fluid buildup. *Id.* Dr. Getachew instructed the nurse to schedule Bogues to see an onsite provider to better assess the swelling in his knee. *Id*.; ECF 16-8, at 27–29.

On November 5, Bogues saw Nurse Mace for pain and swelling of his knee and told her he had been "kneeling a lot to talk under the door and to fish." ECF 16-2, at 18 ¶ 51; ECF 16-8, at 20-23. Mace ordered an x-ray of Bogues's knee and advised him to stay off his knees for at least two weeks. *Id*. She noted that the pain was managed adequately with the current prescriptions of Naproxen and Tegretol; Bogues confirmed that he was not being hindered by pain in his ADLs. *Id*.

On December 2, Bogues had an x-ray of his left knee, which showed "a remote patellar fracture" but no "acute osseous fracture." ECF 16-2, at 18 ¶ 52; ECF 16-5, at 18–19. The radiology report also noted "proliferative spurring" but no "loose bodies" and showed no evidence of soft tissue swelling. ECF 16-2, at 18 ¶ 52; ECF 16-5, at 18–19. Based on the images, the recommendation was to consider conducting a follow-up MRI or CT scan if a hidden or occult fracture was clinically suspected. ECF 16-2, at 18 ¶ 52; ECF 16-5, at 18–19.

On February 26, 2023, Bogues saw Mace and reported his knee symptoms as mild and occurring randomly. ECF 16-2, at 20 ¶ 56; ECF 16-7, at 44–46. Mace noted that Bogues's knee was unchanged from the last exam and that his x-ray showed mild arthritic changes to his knee. ECF 16-2, at 20 ¶ 56; ECF 16-7, at 44–46. Despite the arthritis, Bogues walked easily and reported that he continued to kneel for long periods of time in his cell to engage in fishing and to talk, even though it aggravated his pain. ECF 16-2, at 20 ¶ 56; ECF 16-7, at 44–46. Bogues admitted he was not consistently taking Tylenol or Naproxen as ordered, and Mace observed he was not wearing his knee brace. ECF 16-2, at 20 ¶ 56; ECF 16-7, at 44–46. Bogues was told verbally and in writing that the pain in his knee was caused by arthritis, that he should refrain from kneeling for long periods of time, and that he should take his prescribed pain relievers as needed. ECF 16-7, at 42. He also was advised to ice his knee for 10 minutes at a time, two or three times per day to help manage the pain. *Id*. Mace later noted that she had advised Bogues to pad the floor when fishing under his door to minimize his knee pain. ECF 16-2, at 21 ¶ 59; ECF 16-7, at 31–33.

On April 7, a "Pain Committee" reviewed Bogues's case. ECF 16-2, at 21–22, 60; ECF 16-7, at 24–27. They noted that Bogues had been prescribed Tegretol for a psychiatric condition and was being followed by psychiatry. *Id*. at 27. The Pain Committee recommended a home exercise plan for six to eight weeks, a steroid taper for bursitis in his left knee, and a follow-up

Bogues also claims that, in June 2022, Warden Nines reviewed his ARP, found it meritorious, and was on notice from that ARP that he had a serious medical need that required treatment and medication.  ECF 1, at 4.  Bogues claims that Nines knew that he had been denied pain relief and that he did not receive his orthopedic shoes until October 3, 2022.  *Id*.

As relief, Bogues seeks a declaratory judgment as well as an injunction requiring the defendants to provide him with adequate pain medication, a medical cell for shorter walks to receive medical care, and surgery to remove the fluid from his knee.  ECF 1, at 3.  Bogues also seeks compensatory damages of $138,000.  *Id*.

## II.   Standard of Review

Dr. Getachew filed a motion to dismiss or, in the alternative, for summary judgment, and Nines filed a motion to dismiss.  The Court's review of a Rule 12(b)(6) motion typically is limited to the pleadings, documents attached to the complaint, and the parties' briefs.  *See* Fed. R. Civ. P. 12(b)(6), 12(d); *see also* Fed. R. Civ. P. 10(c).  The Court also may consider judicially noticed facts and documents integral to and explicitly relied on in the complaint when deciding a 12(b)(6) motion.  *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015).  When the Court considers other matters outside the pleadings on a Rule 12(b)(6) motion, it must treat the motion as one for summary judgment under Rule 56, and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).

Bogues received sufficient notice that both motions may be treated as summary judgment motions.  The Court sent notice advising him about the possibility that the motions could be construed as motions for summary judgment and could result in dismissal of his complaint.  ECF

---

evaluation after completion of the home exercise plan to see if physical therapy was needed.  *Id*.
In addition to Tegretol, Bogues was prescribed Tylenol and Naproxen.  *Id*.

17 & 24.  Dr. Getachew filed medical records and prison records as exhibits in support of his motion, and Nines filed an ARP and response in support of his motion.  Moreover, Dr. Getachew's motion, identifying summary judgment as possible relief, provided sufficient notice for Bogues to have a reasonable opportunity to present relevant evidence in support of his position.  *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998).  And, Bogues responded to both motions by submitting documents in support of his position.  ECF 19-1 (declaration), 21-1 (ARP and response), 25-1 (ARP and response).  Thus, the Court is satisfied that Bogues has been advised that the defendants' motions could be treated as motions for summary judgment and that he has been given a reasonable opportunity to present materials in response to the motions.  The Court will resolve the motions under Rule 56.

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in support of its position.  Fed. R. Civ. P. 56(c)(1)(A).  The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  The Court must "view the evidence in the light most favorable to the nonmoving party" and avoid "weigh[ing] the evidence or mak[ing] credibility determinations."  *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017) (quoting *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015)) (internal quotation marks omitted).  However, the Court also must abide by its "affirmative obligation . . . to prevent factually unsupported claims and defenses from

proceeding to trial."   *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)) (internal quotation marks omitted).

If the moving party demonstrates "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmoving party to "present specific facts showing that there is a genuine issue for trial." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015).   A factual dispute is genuine only where there is sufficient evidence to permit a reasonable jury to find in the nonmoving party's favor.   *Id.*; *see also Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019).   "To create a genuine issue for trial, 'the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.'"   *Humphreys & Partners Architects*, 790 F.3d at 540 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)).

## III.    Analysis

Under § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.   42 U.S.C. § 1983.   Section 1983 "is not itself a source of substantive rights, but merely provides 'a method for vindicating federal rights elsewhere conferred.'"   *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *Wahi v. Charleston Area Med. Ctr.*, 562 F.3d 599, 615 (4th Cir. 2009).

### A.  Dr. Getachew

The Court first addresses Dr. Getachew's motion for summary judgment.

Bogues claims Dr. Getachew violated his Eighth Amendment rights.   "The Eighth Amendment protects prisoners from 'unnecessary and wanton infliction of pain.'"   *Thompson v.*

*Commonwealth of Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). Under the Eight Amendment, the government must "provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. To prevail on a claim based on the alleged denial of medical care, a plaintiff must establish that the defendants' actions or their failure to act amounted to "deliberate indifference to serious medical needs." *See id.* at 106; *see also Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). The deliberate indifference standard consists of a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97–98 (quoting *Farmer*, 511 U.S. at 834, 837–38).

"[D]eliberate indifference is 'a very high standard,'" for which "[a] 'showing of mere negligence' will not suffice." *Danser v. Stansberry*, 772 F.3d 340, 347 (4th Cir. 2014) (quoting *Grayson v. Peed,* 195 F.3d 692, 695 (4th Cir. 1999)). The Supreme Court has delineated the difference between tort liability and liability for a constitutional violation:

> The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. *See Prosser and Keeton* §§ 2, 34, pp. 6, 213–214; *see also* Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680; *United States v. Muniz*, 374 U.S. 150 (1963). But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837–38.

The Court has no trouble concluding that Dr. Getachew did not violate Bogues's constitutional right to medical care. According to the voluminous record—recounted in detail above—Dr. Getachew and the medical staff evaluated Bogues when he complained about knee

pain and prescribed him various analgesic drugs in an effort to treat the pain. Bogues's treatment included physical examinations, x-rays, physical therapy, podiatric evaluation, orthotic shoes, and prescriptions for Nortriptyline, Mobic, Ibuprofen, Tylenol, Capsaicin, and Tegretol. Bogues's knee was x-rayed when swelling was observed, and his range of motion and ability to engage in ADLs were evaluated to determine if there was objective evidence that his knee required further surgical or other medical interventions. Additionally, Bogues was advised to ice his knee when the pain flared up and to refrain from prolonged kneeling on his cell floor. In short, there is no record evidence that Dr. Getachew, or any other medical care provider, was deliberately indifferent to Bogues's knee pain.

It appears Bogues wanted a prescription for Ultram or another narcotic, but he had no right to it. The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (emphasis added) (quoting *Bowring v. Godwin*, 551 F.2d 44, 47–48 (4th Cir. 1977)). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *accord Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) ("[W]e consistently have found such disagreements to fall short of showing deliberate indifference."). Bogues has not identified an exceptional circumstance here that warrants departing from this rule.

Dr. Getachew is entitled to summary judgment.

### B.    Warden Jeffrey Nines

Bogues alleges Warden Nines was deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights because Nines knew about Bogues's dispute with

medical care staff regarding his need for treatment of his knee.  ECF 1, at 3–5.  Bogues insists Nines knew about the allegedly inadequate medical care because Bogues filed an ARP and "the Warden found it meritorious" in June 2022.  ECF 1, at 2, 4.

A defendant's own action—or failure to act—is required for liability under § 1983.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).  There is no *respondeat superior* liability under § 1983.  *Love-Lane*, 355 F.3d at 782.  Officials like Nines may be found liable only if the plaintiff shows the official "acted personally in the deprivation of the plaintiff['s] rights."  *Vinnedge*, 550 F.2d at 928 (quoting *Bennett v. Gravelle*, 323 F. Supp. 203, 214 (D. Md.), *aff'd*, 451 F.2d 1011 (4th Cir. 1971)).

To prevail on a claim for supervisory liability under § 1983 based on a subordinate's conduct, the plaintiff must show that (1) the supervisor had actual or constructive knowledge that a subordinate's conduct "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff"; (2) the supervisor responded in a manner that was so inadequate that it showed "deliberate indifference to or tacit authorization" of the subordinate's conduct; and (3) there was "an affirmative causal link between the supervisor's inaction" and the plaintiff's constitutional injury.  *Timpson ex rel. Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

A defendant cannot be found liable simply because he responded to an ARP.  *Whitington v. Ortiz*, 307 Fed. App'x 179, 193 (10th Cir. 2009) (unpublished); *Larson v. Meek*, 240 Fed. Appx. 777, 780 (10th Cir. 2007) (unpublished); *Fuller v. Corizon, Inc.*, No. PWG-19-1705, 2020 WL 607011, at *13 (D. Md. Feb. 7, 2020) ("[T]he mere receipt and processing of an ARP, without more, is insufficient to impose liability.").  Further, Nines himself did not sign the ARP response.  *See* ECF 19-3.  Even if the ARP response was signed on behalf of Nines, Bogues's ARP does not

impute the requisite subjective knowledge to Nines.  Bogues must show that Nines was aware of his unmet need for medical attention and failed to provide it or ensure it was available.  *See Farmer*, 511 U.S. at 834–37.  The only evidence Bogues cites in support of the subjective element of a deliberate indifference claim is the finding that his ARP was meritorious in part.  But a meritorious ARP finding does not mean Nines knew the extent and nature of Bogues's medical care before or after the ARP and response.  Indeed, in the ARP, Bogues complained only that he had not received the orthopedic shoes he needed for his knee pain.  ECF 19-3.  Bogues offers no evidence that Nines knew that he wanted pain medication or other medical treatment or that, after Nines reviewed and responded to his ARP, Nines knew that Bogues still was not receiving the medical attention identified in the ARP.  Bogues has not provided any evidence that Nines "both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his actions were inappropriate in light of that risk.'"  *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017) (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)).

Moreover, Bogues cannot establish a supervisory liability claim against Nines because Bogues has not proven a constitutional violation by another defendant.  *See Cox v. Cnty. of Prince William*, 249 F.3d 295, 301 (4th Cir. 2001) (affirming dismissal of claims against supervisors because their subordinates "did not commit any constitutional violation"); *Givens v. O'Quinn*, 121 F. App'x 984, 991 n.6 (4th Cir. 2005) ("In the absence of a constitutional violation by [a subordinate], this claim [for supervisory liability] necessarily fails.") (per curiam) (unpublished).

Nines's motion, treated as a motion for summary judgment, is granted.

## IV.    Conclusion

Dr. Asresahegn Getachew's and Warden Jeffrey Nines's dispositive motions, ECF 16 and 23, treated as motions for summary judgment, are granted.  Bogues's motion for leave to file

Exhibit D, ECF 21, is granted.  The Clerk shall amend the docket to reflect the full and correct spelling of Dr. Getachew's name and close this case.  A separate order follows.


_March 8, 2024_
Date                                                          Deborah L. Boardman
                                                             United States District Judge